IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| BITNOMIAL EXCHANGE, LLC,<br><br>      Plaintiff,<br><br>vs.<br><br>U.S. SECURITIES AND EXCHANGE COMMISSION, GARY GENSLER, CAROLINE A. CRENSHAW, JAIME E. LIZÁRRAGA, HESTER M. PEIRCE, and MARK T. UYEDA,<br><br>      Defendants. | Case No. |

## **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

### INTRODUCTION

1. This case concerns the continued efforts of the U.S. Securities and Exchange Commission ("SEC") to overextend its jurisdiction over digital assets—in particular, futures contracts on a digital asset—beyond its statutory authority. Here, the SEC asserts jurisdiction over a product that is already regulated by and subject to the exclusive jurisdiction of the Commodity Futures Trading Commission ("CFTC"). In doing so, the SEC inappropriately duplicates and compounds the regulatory burden on Bitnomial.

2. Plaintiff Bitnomial Exchange, LLC ("Bitnomial") is a designated contract market ("DCM") approved by the CFTC. Bitnomial operates an exchange for margined and physically deliverable digital asset futures and options.

3. Pursuant to applicable CFTC rules, on August 9, 2024, Bitnomial filed a self-certification with the CFTC for trading of the XRP US Dollar Futures contract ("XRP Futures") on its exchange on or after August 13, 2024. The XRP Futures contract would allow market

participants to buy and sell the right to physically deliver XRP, a digital asset, on a specific future date for a specific price.

4. After filing its self-certification with the CFTC, but before Bitnomial listed XRP Futures for trading, the SEC contacted Bitnomial to discuss the contemplated listing. In discussions with Bitnomial, the SEC asserted that Bitnomial would violate the federal securities laws if Bitnomial proceeded with its contemplated listing of XRP Futures pursuant to its CFTC self-certification. The SEC asserted that XRP Futures are security futures, which are subject to joint SEC and CFTC jurisdiction (unlike non-security futures which are subject only to the CFTC's exclusive jurisdiction). The SEC further asserted that Bitnomial is required to comply with a host of additional SEC requirements before listing XRP Futures, including the significant task of registering as a national securities exchange ("NSE") and submitting to the SEC's jurisdiction.

5. The SEC takes the view that the underlying asset, XRP, is an investment contract and, therefore, transactions in XRP constitute a security under the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.* (the "Exchange Act").

6. Bitnomial disagrees with the SEC's view that XRP is an investment contract and, therefore, a security, and that XRP Futures are thus security futures. Moreover, the Southern District of New York has already rejected the SEC's position that XRP was a security when traded on a secondary market, as XRP Futures would be.

7. Even setting aside this fundamental disagreement, Bitnomial cannot possibly comply with the Exchange Act's requirements to list XRP Futures. To list a security futures contract based on a single underlying security, the issuer of the underlying security must register it under the Exchange Act. However, as the SEC knows, XRP, which is the underlying security in the SEC's view, is not registered. Further, Bitnomial is not the issuer of XRP and, even if it wanted

2

to, does not have the power to register XRP. Thus, the SEC has effectively blocked Bitnomial from listing XRP Futures.

8. Accordingly, Bitnomial seeks a declaration from this Court pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*, that XRP Futures are not security futures. Bitnomial seeks this declaration prior to listing the contract contrary to the SEC's interpretation of the law, which would expose Bitnomial to SEC enforcement. Bitnomial's only alternative is to acquiesce to the SEC (despite the fact that another federal court has already disagreed with the SEC's very position in this case) and forgo listing XRP Futures (and potentially other digital asset futures) after investing substantial time and resources to fully comply with the CFTC's listing requirements. Given this dilemma created by the SEC, Bitnomial has and will continue to suffer significant hardship if this Court does not rule on its request for a declaratory judgment.

9. Bitnomial also seeks to enjoin the SEC from asserting jurisdiction over XRP Futures or initiating or pursuing any enforcement action against Bitnomial relating to its contemplated listing of XRP Futures.

**PARTIES**

10. Bitnomial was founded in 2014 to create a marketplace connecting native digital asset hedgers with institutional traders. Bitnomial offers state-of-the-art derivatives exchange technology coupled with digital asset settlement systems. The CFTC designated Bitnomial as a DCM on April 17, 2020. Thereafter, two affiliates of Bitnomial were registered with the CFTC as a derivatives clearing organization (Bitnomial Clearinghouse, LLC, in 2023) and as a futures commission merchant (Bitnomial Clearing, LLC, in 2022), thus allowing the Bitnomial family to become the first comprehensive group of affiliated entities to offer a full suite of digital asset

derivatives participation opportunities. Including Bitnomial and its affiliates, there are only 18 actively registered DCMs and 18 actively registered derivative clearing organizations.

11. Defendant SEC is an agency of the federal government headquartered at 100 F Street, NE, Washington, DC 20549. The SEC is charged with enforcing the federal securities laws, including the Exchange Act.

12. Defendant Gary Gensler is Chair of the SEC. He is sued in his official capacity.

13. Defendant Caroline A. Crenshaw is a Commissioner of the SEC. She is sued in her official capacity.

14. Defendant Jaime E. Lizárraga is a Commissioner of the SEC. He is sued in his official capacity.

15. Defendant Hester M. Peirce is a Commissioner of the SEC. She is sued in her official capacity.

16. Defendant Mark T. Uyeda is a Commissioner of the SEC. He is sued in his official capacity.

## JURISDICTION AND VENUE

17. This action arises under the Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.* and the Securities Exchange Act of 1934, 15 U.S.C. § 78a, *et seq.* This Court therefore has jurisdiction pursuant to 28 U.S.C. § 1331.

18. Venue is proper in this district because Plaintiff Bitnomial maintains its principal place of business and resides in this district at 325 West Huron Street, Suite 230, Chicago, Illinois 60654, and no real property is involved in this action. *See* 28 U.S.C. § 1391(e).

## BACKGROUND

### Digital Currencies and XRP

19. A blockchain is a type of shared database that stores data in blocks that are linked together. A blockchain is distributed, which means multiple copies are saved on many machines, and they must all match for it to be valid. Blockchains are immutable, which means that the data entered is irreversible.

20. Since Bitcoin's introduction in 2009, blockchains have been used to create various digital assets, including cryptocurrencies. A digital asset, broadly defined, is virtual or digital money that takes the form of "tokens" or "coins." Many digital assets are intended as a source of payment, transmitting value (akin to digital money) across a decentralized network of users.

21. The XRP Ledger was launched in 2012 as an alternative to Bitcoin. It was designed to increase the speed of transactions, reduce their costs, and minimize energy consumption. Specifically, the XRP Ledger uses a "consensus protocol" to verify transactions. This protocol is faster, more reliable, and less costly than Bitcoin's proof-of-work protocol. For example, transactions on the Bitcoin blockchain usually take about 10 minutes to settle, with settlement times varying, while transactions on the XRP Ledger typically settle in 3 to 5 seconds. Bitcoin transactions can cost up to $60 per transaction, while transactions on the XRP Ledger typically cost a fraction of a penny. Transactions on the XRP Ledger also require less than 0.002% of the computing power required by Bitcoin's proof-of-work mechanism.[1]

22. XRP is the "native currency" of the XRP Ledger.

---

[1] *See* Defs.' Mem. of Law in Supp. of Their Mot. for Summary Judgment, *SEC v. Ripple* (Case No. 1:20-cv-10832), ECF No. 825 ("Ripple MSJ") at 4-5.

23. As of October 9, 2024, there were approximately 61 billion XRP in circulation, out of a max supply of 100 billion. *See* https://xrpscan.com/balances.

24. XRP is a highly liquid, frequently traded digital asset. As of October 9, 2024, XRP had a market cap of around $30 billion, making it the seventh largest cryptocurrency. *See* https://coinmarketcap.com/.

25. Various individuals and businesses have accepted XRP as a form of payment for goods and services. Several major charities have accepted XRP for donations, including the American Red Cross, the American Cancer Society, St. Jude Children's Research Hospital, and Fidelity Charitable. Ripple MSJ at 8.

### The XRP Futures Contract and Bitnomial's CFTC Self-Certification

26. CFTC Rule 40.2 allows a DCM such as Bitnomial to self-certify a product for trading on its exchange.[2] 17 C.F.R. § 40.2. As part of the self-certification process, the DCM must submit the product's rules and an analysis and explanation of the product to the CFTC. *Id.* The DCM must also certify that the product complies with the Commodity Exchange Act and CFTC rules. *Id.* In certain circumstances, the CFTC can stay the trading of a product that has been self-certified. *Id.*

27. On August 9, 2024, Bitnomial filed a self-certification with the CFTC pursuant to CFTC Rule 40.2 for trading of XRP Futures on its exchange on or after August 13, 2024. In doing so, Bitnomial certified to the CFTC that its rules for listing XRP Futures contracts comply with the requirements of the Commodity Exchange Act and the rules promulgated by the CFTC thereunder.

---

[2] A DCM may also submit a product to the CFTC for review and approval, but the large majority of products are approved for trading through the self-certification process.

28. The XRP Futures contract is a physically settled, margined futures contract based on the price of 100,000 XRP. Each futures contract enables a market participant to buy and sell the obligation to deliver or receive 100,000 XRP on a specific future date at a specific price. Prior to delivery, market participants may offset their positions in XRP Futures.

29. Every physical delivery of XRP is anonymous and completed through a clearinghouse regulated by the CFTC. As part of the delivery process, the clearinghouse will novate every futures contract. Thus, the clearinghouse will become the buyer to every seller and the seller to every buyer.

30. CFTC Rule 40.2 permits the CFTC to request additional information relating to a self-certified listing and to stay the listing of a self-certified contract. On August 12, 2024, the Staff of the CFTC requested additional information regarding the certification. That same day, Bitnomial submitted written responses to the CFTC and has not received any further questions or feedback from the CFTC.

31. The CFTC has not stayed the listing of XRP Futures. Accordingly, under CFTC regulations, Bitnomial is now authorized to list XRP Futures for purchase and sale on its exchange.

**The SEC's Position on XRP Futures and the *SEC v. Ripple Labs, Inc., et al.* Litigation**

32. On August 12, 2024, the SEC Staff contacted Bitnomial asking to discuss Bitnomial's planned listing of XRP Futures.

33. On August 21, 2024, the SEC, through its Staff, informed Bitnomial that it believes that the proposed XRP Futures contract is a security futures contract that is subject to the federal securities laws. The SEC's position that the XRP Futures contract is a security futures contract is based on the SEC's assertion that the underlying digital asset, XRP, is an "investment contract" and, therefore, a security under the Securities Act and the Exchange Act. The SEC further asserted

that Bitnomial is required to register as a national securities exchange with the SEC prior to listing XRP Futures.

34. During this discussion, the SEC offered to provide documents to explain its rationale and position. On August 23, 2024, the SEC sent to Bitnomial three summary judgment briefs[3] from *SEC v. Ripple Labs, Inc., et al.* (Case No. 20-cv-10832), a Southern District of New York case where the court analyzed and ruled on whether certain sales of XRP constituted sales of an investment contact.

35. In these summary judgment briefs, the SEC asserted that the Ripple defendants violated Section 5 of the Securities Act when they offered and sold XRP to the public as an unregistered security. The SEC asserted that XRP is an "investment contract" under the test set forth by the Supreme Court in *SEC v. W.J. Howey Co.*, 328 U.S. 29 (1946).

36. The SEC did not note that the district court **rejected** the SEC's argument that all of the XRP sales at issue were of an investment contract, and therefore sales of a security, instead holding that in certain instances XRP was a security, but that in others it was not.

37. Relevant here, on July 13, 2023, the court found that "XRP, as a digital token, is not in and of itself a 'contract, transaction[,] or scheme' that embodies the *Howey* requirements of an investment contract." *SEC v. Ripple Labs, Inc.*, 682 F. Supp. 3d 308, 324 (S.D.N.Y.), *motion to certify appeal denied*, 697 F. Supp. 3d 126 (S.D.N.Y. 2023). The court further found that Ripple's programmatic sales of XRP on digital asset exchanges did not constitute sales of an investment

---

[3] The SEC sent public versions of its Memorandum of Law in Support of its Motion for Summary Judgment (ECF No. 837), Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment (ECF No. 841), and Reply Memorandum of Law in Further Support of its Motion for Summary Judgment (ECF No. 843). These briefs were originally filed under seal in 2022. The SEC's lawsuit against Ripple Labs Inc. and two of its executives was filed in December 2020. The SEC alleged that the defendants violated Section 5 of the Securities Act of 1933 when they sold XRP without first registering it with the SEC. Section 5 of the Securities Act prohibits the sale of securities that are not registered or subject to a valid exemption from registration.

contract, rejecting the SEC's argument to the contrary and thereby rejecting the cornerstone of the SEC's argument here. *Id.* at 328. The court reasoned, in part, that because the exchange sales were blind bid/ask transactions, the buyers could not have known if their payments of money went to Ripple, or any other seller of XRP. *Id.* Put differently, these buyers "stood in the same shoes as a secondary market purchaser who did not know to whom or what it was paying its money." *Id.* at 329. While these buyers of XRP may have purchased XRP with an expectation of profit, "they did not derive that expectation from Ripple's efforts (as opposed to other factors, such as general cryptocurrency market trends)." *Id.*

38. The court further reasoned that Ripple did not make any promises or offers with respect to the programmatic sales and there was no evidence that secondary market purchasers were familiar with Ripple's promotional materials or would have been aware of Ripple's statements connecting XRP's price to its own efforts. *Id.* at 329-30. Additionally, the sales were not made pursuant to contracts that contained lockup provisions, resale restrictions, indemnification clauses, or statements of purpose. *Id.* at 329. These factors led the court to conclude, as a matter of law, that the secondary market sales did not satisfy the third prong of *Howey*: "a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others." *Id.* at 328.

39. The only sales at issue in Ripple that the court found *did* constitute sales of investment contracts were sales of XRP directly from Ripple to institutional buyers pursuant to written contracts, not sales on any secondary market. The court reasoned that these institutional buyers understood that XRP's value would be derived from Ripple's managerial efforts based, in part, on Ripple's marketing of XRP, which included brochures touting XRP as an investment tied to Ripple's success. Those sales are not relevant here.

40. As recently as October 2, 2024, the SEC confirmed its position, filing a notice that it was appealing the district court's ruling. *SEC v. Ripple Labs, Inc., et al.* (Case No. 20-cv-10832), ECF No. 978.

**The SEC's Authority Is Limited and Does Not Extend to XRP Futures.**

41. The SEC's authority is limited to transactions in securities.[4] The term "security" is defined in the Exchange Act to include a specific list of financial instruments, including any note, stock, treasury stock, security future, security-based swap, bond, debenture, or investment contract. 15 U.S.C. § 78c(a)(10). The term "investment contract" is not defined in the Exchange Act.

42. The Exchange Act defines a "security future" as a "contract of sale for future delivery of a single security or of a narrow-based security index, including any interest therein or based on the value thereof," with certain exceptions. 15 U.S.C. § 78c(a)(55)(A).

43. Whether XRP Futures are security futures, therefore, turns on whether the underlying product, XRP, is a security.

44. As *Ripple* already held, XRP is not inherently a security: "XRP, as a digital token, is not in and of itself a 'contract, transaction[,] or scheme' that embodies the *Howey* requirements of an investment contract." *Ripple*, 682 F. Supp. 3d at 324. In seeking interlocutory appeal of *Ripple*, the SEC noted that it was not arguing "that the asset underlying those investment contracts

---

[4] By contrast, commodities, like gold or soybeans, are fundamentally distinguishable from securities even though, like securities, they are traded on public markets. The definition of a "commodity" is set forth in Section 1a(9) of the CEA, which defines a "commodity" to include specifically enumerated agricultural products and, with limited exceptions, "all other goods and articles . . ., and all services rights and interests . . . in which contracts for futures delivery are presently or in the future dealt in." 7 U.S.C. § 1a(9). That definition encompasses goods, articles, services, rights, and interests which are the subject of futures contracts, as well as other goods, articles, services, rights or interests in the same category or class. XRP Futures are futures under the CEA and subject to the applicable provisions of the CEA and the rules promulgated thereunder. Commodity futures that are not security futures are exclusively regulated by the CFTC. *See* 7 U.S.C. § 2(a)(1)(A).

[i.e., XRP] were necessarily a security."[5] Other courts have consistently recognized that a digital asset "is not in and of itself" an investment contract under Howey.[6]

45. Further, while certain specific sales of XRP that are not at issue here may be investment contracts, *Ripple* was also clear that anonymous sales of XRP on the secondary market are not sales of investment contracts. *Ripple*, 682 F. Supp. 3d at 328-30. Among other things, such sales lack an investment made with the expectation of profit from the managerial efforts of others under *Howey*. *Id.*

46. XRP, the digital token and underlying product here, is not in and of itself a security. Further, XRP is not a security when exchanged anonymously on a secondary market. Therefore, XRP Futures, which would be physically settled through anonymous exchanges of XRP, cannot possibly be security futures.

**Bitnomial Has and Will Continue to Suffer Hardship If this Court Does Not Intervene.**

47. Without Court intervention, Bitnomial will be left in an untenable position.

48. Bitnomial is forced to choose between (1) abandoning its plans to list XRP Futures, thereby acquiescing to the SEC's position, which has already been rejected by a federal court, even though Bitnomial has already invested the time and resources to comply with all applicable CFTC listing requirements, or (2) listing XRP Futures contrary to the SEC's view of the law and risking the penalties that would accompany such a violation.

---

[5] *See* Pl.'s Mem. of Law in Supp. of Mot. to Certify Interlocutory Appeal, *SEC v. Ripple* (Case No. 1:20-cv-10832), ECF No. 893 at 16.

[6] *See, e.g.*, Order Denying Motion to Dismiss and Setting Case Management Conference at 15, *SEC v. Payward, Inc.*, No. 23-cv-06003 (N.D. Cal. Aug. 23, 2004), ECF No. 90 (compiling cases and rejecting the SEC's allegation that "the crypto assets themselves—as in, the individual tokens bought, sold, and traded on [defendant's] platform—are investment contracts"); *SEC v. Binance Holdings Ltd.*, 2024 WL 3225974, at *11 (D.D.C. June 28, 2024) (rejecting the SEC's suggestion that the token itself is the investment contract).

49. Compliance with the law, as the SEC sees it, is not possible or feasible as it applies to XRP Futures.

50. To list a single stock security future (such as XRP Futures, if XRP were deemed to be a security), the underlying security must be registered under Section 12 of the Exchange Act, unless an exception is created through joint SEC and CFTC rulemaking. 15 U.S.C. § 78f(h)(3)(A). Since there is no applicable joint rulemaking, XRP would need to be registered by the issuer if it were a security.

51. However, XRP is not, and likely could not be, registered as a security. First, securities must be registered by the "issuer," which is not Bitnomial. *See* 15 U.S.C. §§ 78c(a)(8), 78l. Because the underlying digital asset, XRP, is not registered, Bitnomial cannot register XRP Futures as a security future.

52. Even setting aside this fundamental problem with the SEC's view of the law, treating XRP Futures as a security future would require Bitnomial to register as a national securities exchange with the SEC in order to list XRP Futures. *See* 15 U.S.C. § 78f(g). Doing so would not only subject Bitnomial to unwarranted and improper SEC jurisdiction and regulation, but also impose a time-consuming and costly burden on Bitnomial.

53. While a notice of registration as a national securities exchange pursuant to Section 6(g) of the Exchange Act is available to exchanges that register for the sole purpose of trading security futures products, such a notice still imposes a significant burden and, more importantly, triggers the jurisdiction of the SEC. Such a registration here would effectively force Bitnomial to concede that the SEC has jurisdiction over XRP Futures.

## COUNT I – DECLARATORY RELIEF

54. Bitnomial realleges and incorporates by reference the preceding allegations as though fully set out herein.

55. The Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*, authorizes declaratory judgment actions to be brought in federal court. A declaratory judgment action allows a party that is not certain of its rights to obtain an adjudication before the adversary brings a lawsuit for damages.

56. The SEC has unequivocally asserted to Bitnomial its view that XRP Futures are security futures and that Bitnomial must, among other things, register as a national securities exchange if it wants to list XRP Futures.

57. Further, the SEC has unequivocally asserted publicly that XRP is a security when traded anonymously on the secondary market in the *Ripple* case. The SEC adopted its same position in the *Ripple* case in communications with Bitnomial and, in doing so, sent its briefing in *Ripple* to Bitnomial, despite the fact that the Southern District of New York rejected the SEC's position as to sales on the secondary market *before* the SEC sent its briefs to Bitnomial.

58. The SEC persists in taking the untenable and rejected view that XRP is a security.

59. Bitnomial has no other redress, absent relief from this Court. There is no process for Bitnomial to appeal the SEC's position.

60. Further, as discussed above, even if Bitnomial accepted the SEC's position, Bitnomial still could not comply with the applicable requirements to list XRP Futures as security futures because XRP, the underlying asset, is not registered as a security with the SEC.

61. Bitnomial has already invested significant time and resources in complying with applicable CFTC listing requirements.

62. Without a ruling from this Court, Bitnomial must either abandon its plans or list XRP Futures and face potential enforcement from the SEC. "[W]here threatened action by government is concerned, [the court does] not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128-29 (2007).

63. Whether XRP Futures are properly classified as security futures under the Exchange Act is a purely legal question that can and should be resolved by this Court.

## COUNT II – INJUNCTIVE RELIEF

64. Bitnomial realleges and incorporates by reference the preceding allegations as though fully set out herein.

65. This Court has the inherent power to grant injunctive relief against federal officials who are violating, or planning to violate, federal law. *See Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326–27 (2015).

66. The SEC is exceeding its statutory authority by asserting jurisdiction over XRP Futures and Bitnomial. As discussed above, the SEC has and continues to assert—in violation of the Exchange Act—that XRP Futures are security futures and that Bitnomial must register as a national securities exchange before listing XRP Futures.

67. Bitnomial has and will continue to suffer irreparable harm as a result of the SEC's overreach. Bitnomial is unable to list XRP Futures without running afoul of the SEC's interpretation of the law.

68. The benefits of granting injunctive relief outweigh any injury to the SEC and the public interest will not be harmed by the relief requested herein.

**PRAYER FOR RELIEF**

WHEREFORE, Bitnomial respectfully requests that the Court enter a judgement:

a) Declaring that the XRP Futures contract is not a security futures contract under the Exchange Act;

b) Granting permanent injunctive relief preventing the SEC from asserting jurisdiction over XRP Futures or pursuing any investigation or enforcement action against Bitnomial relating to listing, trading, purchasing, or selling XRP Futures on Bitnomial's exchange;

c) Awarding Bitnomial its reasonable costs and attorneys' fees, incurred in bringing this action under 28 U.S.C. § 2412, or other applicable law; and

d) Granting such other and further relief as this Court deems just and proper.

Dated: October 10, 2024

Respectfully submitted,

By: /s/ Matthew F. Kluchenek

Matthew F. Kluchenek
Christian T. Kemnitz
Elliott M. Bacon
Carrie M. Stickel
Katten Muchin Rosenman LLP
525 W. Monroe Street
Chicago, IL 60661-3693
Telephone: (312) 902-5200
Facsimile: (312) 902-1061

Daniel J. Davis
Katten Muchin Rosenman LLP
1919 Pennsylvania Ave NW
Suite 800
Washington, DC 20006-3404
Telephone: (202) 625-3644
*Pro hac vice forthcoming*

*Counsel for Plaintiff Bitnomial Exchange, LLC*